People v N.W. (2026 NY Slip Op 50147(U))

[*1]

People v N.W.

2026 NY Slip Op 50147(U)

Decided on February 9, 2026

Supreme Court, Bronx County

Stone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 9, 2026
Supreme Court, Bronx County

The People of the State of New York

againstN.W., Defendant.

Ind. No. 71218-22

ADA David Birnbaum, Office of the Bronx County District Attorney, for the People.Florian Miedel, Esq., for the Defendant.

Audrey E. Stone, J.

The defendant is charged with murder in the second degree and related charges for allegedly killing his intimate partner. This Court has ordered three competency examinations of the defendant, which occurred on April 16, 2024, December 3, 2024, and August 11, 2025. Each examination resulted in the two psychiatric examiners finding the defendant fit to stand trial. On January 16, 2026, this Court presided over a hearing under CPL § 730.30(2) to determine whether these findings should be controverted. For the reasons that follow, the Court controverts the examiners' findings, adjudicates the defendant an incapacitated person, and issues an order of commitment (see CPL § 730.50[1]).
The parties each called one expert witness. The People called Dr. S. Chase Martin, PsyD, and the defense called Dr. Alexander Sasha Bardey, MD. The Court finds that both doctors carefully reviewed the relevant records, have substantial professional experience; and credits their testimonies in their entirety. In addition to testimony, the Court considered the prior reports submitted from each exam, records from the defendant's observation at Bellevue hospital, and the expert report of Dr. Bardey. The Court also has taken into consideration its own observations of the defendant and defense counsel's affirmations regarding his client's inability to communicate and participate in his defense. 
Dr. Martin directs the court clinics that conduct examinations under CPL Art. 730 in Bronx and New York counties. He has conducted nearly 700 exams under CPL Art. 730. Dr. Martin cross-conducts these exams with another examiner. The exams assess whether the defendant can assist and participate with counsel, e.g., does the defendant understand the criminal process, the role of the parties and the judge, and the options available such as going to trial or pleading guilty. During an examination, Dr. Martin considers whether the defendant is feigning or exaggerating for secondary gain. He looks for discrepancies between "what [the defendant] is reporting and perhaps what others are observing." He also considers whether what the defendant is reporting has been consistent over time and in different environments.
The defendant's first examination occurred on April 16, 2024, at the courthouse in a designated interview room. The defendant was initially offered an opportunity to participate by video and refused. Dr. Martin examined the defendant with Dr. Diana Dimitri. The defendant was mostly engaged and pleasant although he was also guarded, evasive, and sometimes joked inappropriately. At times during the exam, he sang and stated inconsistent things such as that [*2]this case was his first arrest, but he had been incarcerated all his life. 
During this interview, Dr. Martin did not observe signs of any specific severe mental illness. Dr. Martin also reviewed Correctional Health Services records prior to the April examination, which corroborated some of his own observations, such as the defendant's grandiose and rambling behaviors. The records contained references to a substance abuse psychotic disorder, which Dr. Martin believed to be related to the defendant's admitted use of K2, a synthetic cannabinoid. According to Dr. Martin, K2 can cause psychoactive effects that mimic symptoms of a psychotic disorder like hallucinations, paranoia, and delusions. To be diagnosed with a disorder like schizophrenia, a person's symptoms would need to persist for weeks to months and not appear on an acute basis. Dr. Martin noted that in the defendant's case these symptoms remitted at times making it less likely he suffered from a severe mental disease. 
For the second exam ordered on December 3, 2024, Dr. Martin and Dr. Dimitri examined the defendant at the courthouse as the defendant refused to conduct the examination by video. Once transported to the courthouse, he then refused to meet in the interview room with the doctors. As a result, the doctors had to be escorted down to a Department of Corrections holding area to speak with the defendant. During this limited interaction, the defendant would not engage and appeared intoxicated. He was loud, slurred his words, and made sexually inappropriate comments to Dr. Dimitri. The two spent around 10-15 minutes with the defendant. They advised him that by refusing to speak with them the defendant could potentially delay court proceedings against him, but this warning did not change the defendant's behavior.
Since the defendant would not participate in the examination, the doctors were compelled to rely on his continued medical records from Correctional Health Services. The records revealed that, while the defendant had been transferred to a mental observation unit, he was discharged without any diagnosis for a severe mental illness or treatment with antipsychotic or antimanic medications. Based on these records, and the prior examination of the defendant, Dr. Martin and Dr. Dimitri found the defendant fit.
Given the defendant's past refusal to be interviewed by Dr. Martin and his colleague, Dr. Martin conferred with his superior, Dr. Colley, in determining the best way of conducting the third court-ordered exam. It was agreed that the defendant should be transferred to Bellevue Hospital for observation and to conduct the exam. In that environment, the defendant had continued interaction with treating physicians and less ability to access K2. The defendant was hospitalized at Bellevue from August 5, 2025, to August 11, 2025. Throughout this hospitalization, the defendant engaged in a myriad of outbursts and inappropriate behaviors. In an August 6, 2025, note, the defendant was documented as erupting during an art therapy session, throwing a box of pastels at the wall and abruptly leaving the room. In a different note that day, the defendant became upset that staff could not warm his coffee. He slapped the coffee from a nurse's hand and became hypersexual, telling the nurse that he would "suck" his private parts in exchange for having the coffee warmed. The defendant then continued to be hypersexual towards other staff and claimed to be affiliated with Roc Nation. Eventually, he apologized for being agitated and sang high notes as he walked away. In the early hours of August 7, 2025, during medication time, the defendant exposed his genitals to nurse and ancillary staff. He was later seen walking around topless, shadow boxing, and speaking loudly. The defendant asked for a toothbrush, toothpaste, and mouthwash. When he received only the toothbrush and toothpaste, he slapped a staff member's hand and postured to fight. Verbal intervention ultimately led to the defendant becoming calmer and he agreed to take Haldol and [*3]Ativan. Later in the day, on August 7, 2025, the defendant punched another patient. Notes from August 8, August 9, and August 10, 2025, documented various instances of the defendant screaming and responding to internal stimuli, pacing, singing in the hallways, and shadowboxing. A note from August 9, 2025, referred to the defendant shadow boxing, walking around topless, and exposing his genitals. A different note from a physician on August 9, 2025, documented the defendant making grandiose claims that he was a "porn star and needed to go to auditions," which he could not do because of his incarceration. The defendant expressed fear that he was not safe at Bellevue despite his being the one to start fights with other patients. In one particularly volatile instance on August 10, 2025, an outburst led to the defendant's involuntary restraint and medication.
On August 11, 2025, Dr. Martin and Dr. Dimitri attempted to meet with the defendant in Bellevue's prison ward. The defendant refused to participate, because Dr. Martin was wearing a surgical mask. The defendant made references to his "record deal," and was irritable, demanding, and uncooperative. Since Dr. Martin and Dr. Dimitri could not examine the defendant, they relied on notes by Dr. Jia, the attending physician at Bellevue. Dr. Jia noted that she was able to have a rational, reasonable conversation with the defendant for 30 minutes. She also observed him speak on the phone, during which time she did not notice anything abnormal. Based on this, Dr. Martin believed that the defendant had the ability to engage in a coherent, logical, and organized manner if he so chose. Dr. Martin noted that other than emergency medication administered to the defendant for agitation, his treatment at Bellevue did not include psychiatric medication. Dr. Martin did not believe that the defendant had consumed illicit drugs during his time at Bellevue. 
In sum, Dr. Martin concluded that the defendant's behaviors were more in line with character pathology than a severe mental illness. He noted that the defendant was never prescribed antipsychotic or antimanic medications and had multiple instances of substance use. The findings of Dr. Martin and Dr. Dimitri came to the conclusion that the defendant had the ability to assist in his defense, and that his violent and inappropriate behaviors were capable of control.
The defense witness, Dr. Bardey, is a forensic psychiatrist with a significant background in conducting forensic competency exams. On three separate occasions, Dr. Bardey attempted to meet with the defendant, but the defendant refused to be produced. As a result, his report relied upon a collateral interview with the defendant's mother, the 730 reports, and the defendant's medical records,
The defendant's mother reported to Dr. Bardey, that she had not observed any prominent symptoms of psychiatric symptoms prior to his arrest other than incidences of depression. She did notice a change following his arrest, in which he seemed "spacey", and was making grandiose statements during phone calls. The Court notes that both parties acknowledge that the defendant has placed bizarre phone calls from Rikers Island that have been recorded and are part of the Court record. Dr. Bardey concluded that the defendant's mood instability and other behaviors like hypersexuality, grandiosity and being assaultive were consistent with mania and that he could not conclusively eliminate a diagnosis of a severe mood disorder, like bipolar disorder, with psychotic features. Dr. Bardey also believed that what had been described to the Court as substance-induced mania could be the result of psychotic mania. 
Unable to opine upon the defendant's fitness to proceed, Dr. Bardey recommended further study of the defendant in a psychiatric facility. Extended study could shed light on [*4]whether the defendant was feigning, since it would be challenging to feign symptoms for a lengthy period. In addition, treatment at a secure, psychiatric facility would presumably eliminate the possibility that the defendant's symptoms result from K2 ingestion. 
After the conclusion of the witnesses' testimony, defense counsel shared his own observations of the defendant with the Court. Counsel noted that in 2023 the defendant was better able to communicate. In 2024, things worsened with the defendant singing, refusing to engage, and walking out of counsel visits. The Court has also taken notice of its ongoing observations of the defendant, which are discussed, infra.
Conclusions of Law
At a hearing under CPL § 730.30(2) to determine whether the psychiatric examiners' findings of fitness should be controverted, the People bear the burden of proving a defendant's competency by a preponderance of the evidence (see People v Mendez, 1 NY3d 15, 19 [2003]). "Criminal defendants are incompetent to stand trial if their 'mental condition is such that [they] lack[ ] the capacity to understand the nature and object of the proceedings against [them], to consult with counsel, and to assist in preparing [their] defense'" (Musaid v Kirkpatrick, 114 F4th 90, 108 [2d Cir 2024], quoting Drope v Missouri, 420 US 162, 171 [1975] [alterations in original]; accord CPL § 730.10[1]). A hearing court may, in addition to the testimony and other evidence adduced, "consider its own personal observations of a defendant in determining fitness for trial" (People v Phillips, 16 NY3d 510, 517 [2011]). Relevant amongst those personal observations are "the manner in which the defendant interacts with the court, communicates with defense counsel, or physically reacts to a question or piece of testimony" (Phillips, 16 NY3d at 517).
Evidence that is evenly balanced, or inconclusive, does not meet a burden of a preponderance of the evidence (see Rinaldi & Sons, Inc. v Wells Fargo Alarm Serv., Inc., 39 NY2d 191, 196 [1976]; 300 E. 34th St. Co. v Habeeb, 248 AD2d 50, 55-56 [1st Dept 1997]; D'Amico v Manufacturers Hanover Tr. Co., 173 AD2d 263, 265 [1st Dept 1991]; Daniel v Allstate Life Ins. Co., 71 AD2d 872, 872-73 [2d Dept 1979]; Matter of William EE, 157 AD2d 974, 976 [3d Dept 1990]). Here, because the evidence of the defendant's competency is evenly weighted and inconclusive, the People did not meet their burden.
The record contains evidence that the defendant repeatedly behaved in bizarre, inappropriate, and even threatening ways with both the 730 examiners and hospital staff at Bellevue. He was observed to be hypersexual as well as grandiose with beliefs that he had a record deal and was a pornographic film star. He was also preoccupied by intrusive thoughts. He made unwanted sexual advances against numerous people and was assaultive at Bellevue, requiring, during one incident, physical restraint. He refused to engage with the 730 examiners, Dr. Martin and Dr. Dimitri, as well as his counsel's retained expert, Dr. Bardey. 
The Court's observations of the defendant raise serious concerns about his mental state and fitness (Phillips, 16 NY3d at 517). Each time that the defendant is brought to the courthouse from Rikers Island, tremendous security is necessary to ensure the safety of the Court, counsel, staff, and the public. During one appearance, the defendant began to sing to the family of the deceased seated in the courtroom. At another appearance, the defendant was aggressive and repeatedly threatened to spit on his attorney. The defendant had to be removed from the hearing in this matter due to his highly obstructive behavior. Notably, the Court was informed that the defendant's dangerous, volatile conduct also caused extraordinary security concerns in transporting him to court. The defendant's conduct in the courtroom has also required [*5]heightened court officer security. Counsel has also represented to the Court the repeated difficulties he faces in trying to meet with the defendant. 
Ultimately, from the hearing testimony the Court is not persuaded that the defendant's behaviors are the result of K2 substance abuse, a severe mental illness, a character disorder or some form of feigning to achieve a secondary gain. The court's examiners, and the defendant's own expert, found themselves stymied in their efforts by the same bizarre and aggressive behaviors the defendant has exhibited in court, with staff at Bellevue, and his own attorney. The evidence of the defendant's fitness is equally weighted and inconclusive. As a result, the People have not met their burden of a preponderance of the evidence (see Wells Fargo Alarm Serv., Inc., 39 NY2d at 196; Habeeb, 248 AD2d at 55-56; Manufacturers Hanover Tr. Co., 173 AD2d at 265; Allstate Life Ins. Co., 71 AD2d at 872-73; William EE, 157 AD2d at 976; see also Mendez, 1 NY3d at 19). For these reasons, the Court controverts the examiners' findings of fitness, adjudicates the defendant an incapacitated person, and issues an order of commitment.
This constitutes the decision and order of the Court.
Dated: February 9, 2026Bronx, New YorkAudrey E. Stone, A.J.S.C.