People v Breckenridge (2018 NY Slip Op 04074)





People v Breckenridge


2018 NY Slip Op 04074


Decided on June 7, 2018


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on June 7, 2018

Sweeny, J.P., Richter, Webber, Gesmer, Moulton, JJ.


6347 4460/11

[*1]The People of the State of New York, Respondent,
v
Travis Breckenridge, Defendant-Appellant.


Christina Swarns, Office of the Appellate Defender, New York (Katherine M.A. Pecore of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Megan DeMarco of counsel), respondent.



Judgment, Supreme Court, New York County (Michael J. Obus, J. at CPL article 730 hearings; Laura A. Ward, J. at jury trial and sentencing), rendered September 3, 2014, convicting defendant of assault in the first degree and criminal possession of a weapon in the second degree (two counts), and sentencing him to concurrent terms of 15, 10, and 10 years, respectively, modified, as a matter of discretion in the interest of justice, to the extent of vacating the assault conviction and remanding for a new trial on that count, and otherwise affirmed.
As in cases such as People v Velez (131 AD3d 129 [1st Dept 2015]), the court's jury charge failed to convey that an acquittal on the top count of attempted second-degree murder based on a finding of justification would preclude consideration of the count of first-degree assault. We find that this error warrants reversal of the assault conviction in the interest of justice, and we reject our dissenting colleague's contention that the error was harmless. In Velez, we held that, "[b]ecause there is no way of knowing whether the acquittal of the top count of attempted murder in the second degree was based on a finding of justification by the jury, the two counts of the indictment that resulted in conviction must be reversed" (Velez, 131 AD3d at 134).
Our dissenting colleague takes the position that the jury's acquittal on the top count of attempted murder in the second degree could not possibly have been based on justification. We disagree. Given the testimony of an eyewitness that the victim was running toward defendant holding a knife when defendant fired the weapon, a jury may well have concluded that defendant's conduct was justified. Thus, it cannot be said that there was "overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given" (People v Petty, 7 NY3d 277, 286 [2006]).
"While the jury may have acquitted on the top charge without relying on defendant's justification defense . . . it is nevertheless impossible to discern whether acquittal of the top count . . . was based on the jurors' finding of justification so as to mandate acquittal on the two lesser counts" (People v Rodriguez, 143 AD3d 497, 498 [1st Dept 2016] [internal quotation marks omitted], lv dismissed 28 NY3d 1150 [2017]; People v Rowley, 138 AD3d 577, 578 [1st Dept 2016], lv denied 27 NY3d 1138 [2016]; see also People v Colasuonno, 135 AD3d 419, 419-420 [1st Dept 2016]).
The court properly found defendant fit to proceed to trial following CPL article 730 examinations. Psychiatric reports and defendant's own statements in court showed that he "evinced an understanding of the purpose of a trial, the actors in a trial, their roles, the nature of the charges against him, and the severity of a potential conviction and sentence" (People v Phillips, 16 NY3d 510, 518 [2011]). The court reasonably credited experts who found that defendant's psychiatric symptoms had been alleviated by compliance with his medication regimen, thus rendering his past history an unreliable indicator of his present competency. Defendant's "questionable decisions" as to trial strategy (People v Snyder, 29 AD3d 310, 310 [*2][1st Dept 2006], lv denied 7 NY3d 818 [2006]), such as presenting inconsistent defenses and denying any participation in the
shooting despite the strong evidence of his guilt, did not establish that he was suffering from delusions preventing him from having a "factual understanding of the proceedings against him" (People v Mendez, 1 NY3d 15, 19 [2003] [internal quotation marks omitted]) or from cooperating with his attorney. "Moreover, the [hearing] court had the opportunity to observe defendant's behavior and to evaluate the testimony of the psychiatrists in that context" (id. at 20).
We perceive no basis for reducing the sentences imposed on the remaining counts.
All concur except Webber, J. who dissents in part in a memorandum as follows:




WEBBER, J. (dissenting in part)


While I concur that we are bound by this Court's prior rulings in People v Velez (131 AD3d 129 [1st Dept 2015]), and its progeny, I disagree that such adherence mandates remand for a new trial on the charge of assault in the first degree. Accordingly, I would affirm the conviction in all respects.
Lonnie Payne testified that on September 5, 2011 at approximately 11:45 a.m., he was walking east on West 127th Street, between Seventh and Eighth Avenues, in New York County, toward his apartment. While he was about halfway between Seventh and Eighth Avenues, he saw two men "pop[]out" from between two parked cars, about 25 feet ahead of him. One of those men wore glasses and dark clothing, and held a black coat over his left arm. Payne recognized him as defendant, having bought loose cigarettes from defendant at a nearby street corner. The two men faced each other and seemed to be "wrestling" or "slap-fighting." Less than one minute after the men emerged, Payne heard three to five "bangs" or "pops," then saw feathers flying out of the coat being held by defendant, who quickly walked away, toward Eighth Avenue. Payne approached the other man, whom he did not know, and who was later identified as Leo O'Brien, and saw that he was bleeding profusely from his abdomen. O'Brien briefly walked but collapsed near the corner of West 127th Street and Seventh Avenue. Payne testified that he remained with O'Brien throughout, and after calling 911 stayed until the police and the ambulance arrived. According to Payne, he did not see a knife, broken bottle or sharp object in O'Brien's hand or on his person before or after the shooting. O'Brien sustained two gunshot wounds to his abdomen and one to his left arm.
Detective Joseph Carinha testified that on September 5, 2011, after having been assigned the shooting, he and Detective Antonio Rivera went to defendant's apartment located at 277 West 127th Street, apartment 2G. Detective Donna Torres and Officer Diana Rodriguez went to the side of the building corresponding to the "G" units. As Detective Carinha knocked on the door to apartment 2G and announced that he was a police officer, Detective Torres and P.O. Rodriguez observed a hand open the bathroom window on the second floor and drop a black bag onto the grass-covered ground. Defendant exited the apartment approximately five minutes after Detective Carinha knocked and was arrested at the scene. The police found no one else in the apartment. Detective Torres identified defendant's apartment as the one from which the bag was thrown. Police Officer Elmer Lopez retrieved a loaded semiautomatic 9 millimeter pistol from the bag. There were two rounds in the magazine and one in the chamber. While there were no discernable fingerprints found on the gun, defendant's DNA was found on it.
Testimony was elicited that pursuant to a search warrant of defendant's apartment, a black down jacket that was torn in multiple places and covered in feathers was recovered. Cartridge cases were found at the scene; however, no weapons, including a knife, were found. The cartridge cases were determined to have been ejected from the 9 millimeter pistol found in the bag tossed from defendant's apartment window.
Finally, the People introduced surveillance video which showed defendant wearing a white T-shirt, white shorts, and sneakers, entering the location of 277 West 127th Street at 11:40 [*3]a.m. Four minutes later, defendant is seen exiting, wearing glasses, a dark hoodie, jeans, and boots; the front pocket of his sweatshirt appears weighted down. Then, at 11:49 a.m., the video shows defendant entering his apartment building while holding a puffy black coat.
Defendant testified that he did not sell cigarettes and that he did not know either Leo O'Brien or Lonnie Payne. He stated that he may have seen O'Brien around but did not know him or know his name. He stated that on September 5, 2011, he might have left his apartment "a couple of times" to go to a store for soda and cigarettes, but did not fight with anyone or have a gun that day. He testified that he retrieved his jacket that day, but did not remember from whom he retrieved it. He also did not know why the jacket was torn, but believed he might have torn it himself.
According to defendant, on the date of the incident he lived alone and on that date, when the police arrived at his apartment, there was no one in the apartment other than himself. Defendant admitted that he was the person shown on the surveillance video footage.
Adrian Knowles testified that on the morning of September 5, 2011, she was sitting on a bench outside her apartment building, located near defendant's building, talking to a woman who was gardening. According to Knowles, she saw defendant walking toward Eighth Avenue while wearing a coat with a torn sleeve. Knowles said "hello" to defendant, who merely kept walking. About two to five minutes after seeing defendant walk by, Knowles testified, she saw O'Brien running behind defendant while carrying a knife. According to Knowles, O'Brien had the knife by his head with his hand extended outward. Knowles demonstrated this for the jury. Upon seeing O'Brien with the knife, Knowles called out defendant's name to warn him. Defendant turned around, and Knowles then heard three gunshots.
According to Knowles, she saw defendant continue walking while O'Brien stayed where he was. Knowles went into her building and called defendant's family but did not call the police. Knowles testified that she and the woman gardening were the only other people on the street at the time of the incident. Knowles acknowledged that she had known defendant for 12 years and had been in an intimate relationship with him which ended in 2008. She also testified that she had known O'Brien, whom she knew as "O," for about one year before he was shot. Defendant testified that he did not remember whether he saw Knowles that day. He described their relationship as "hi and bye."
It was the People's theory that defendant and O'Brien had earlier engaged in an altercation wherein O'Brien cut or tore defendant's jacket and that defendant then went to his apartment, retrieved a gun, returned to the street and shot O'Brien three times.
The court submitted to the jury the charges of attempted murder in the second degree, assault in the first degree, and two counts of criminal possession of a weapon in the second degree.
Defendant was acquitted of attempted murder in the second degree, but convicted of assault in the first degree and two counts of criminal possession of a weapon in the second degree.
The court instructed the jury, in pertinent part, as follows:
"Now, with respect to Counts 1 and 2 which are the Attempt to Commit the Crime of Murder in the Second Degree and Assault in the Second Degree, the defendant has raised the defense of justification also known as self-defense. The defendant, however, is not required to prove that he was justified. The People are required to prove beyond a reasonable doubt that the defendant was not justified.
. . .
"Under our law, a person may use deadly physical force upon another individual when and to the extent that he reasonably believes it to be necessary to defend himself from what he reasonably believes to be the use or imminent use of deadly physical force.
"Some of the terms used in the definition have their own special meaning. So I will now define deadly physical force,' and reasonably believes.'
"Deadly physical force means physical force which under the circumstances in which it's [*4]used is repeatedly capable of causing death or other serious physical force.
"Serious physical force means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or function of any bodily organ.
"The determination of whether a defendant reasonably believed deadly physical force to be necessary to defend himself from what he reasonably believes to be the use or imminent use of deadly physical force by another individual requires the application of a two-part test.
"First, the defendant must have actually believed that Leo O'Brien was using or was about to introduce deadly physical force against him and that the defendant's own use of deadly physical force was necessary to defend himself.
"Second, a reasonable person in the defendant's position knowing what the defendant knew and being in the same circumstances would have the same beliefs.
. . .
"The defendant would not be justified if he was the initial aggressor of deadly physical force, except that the defendant's use of deadly physical force would, nevertheless, be justified if he had withdrawn from the encounter and effectively communicated such withdrawal to Leo O'Brien, but Leo O'Brien persisted in continuing the incident by use or threatened use of imminent deadly physical force.
. . .
"The defendant would not be justified if he knew he could, with complete safety to himself, avoid the necessity of using deadly physical force by retreating. The defendant would not be justified if Leo O'Brien's conduct was provoked by the defendant himself with the intent to cause physical injury to Leo O'Brien."
The court concluded the instruction on justification as follows:
"The People are required to prove beyond a reasonable doubt that the defendant was not justified. It is thus an element of Counts 1 and 2 that the defendant was not justified. As a result, if you find that the People have failed to prove beyond a reasonable doubt that the defendant was not justified, then you must find the defendant not guilty of Counts 1 and 2."
The court then instructed the jury as to the elements of
attempted murder in the second degree and assault in the first
degree:
"Under our law, a person is guilty of Murder in the Second Degree when with intent to cause the death of another person, he causes the death of such person.
. . .
"The question naturally arises as to how to determine whether or not a defendant had an intent required for the commission of a crime. To make that determination in this case, you must decide if the required intent can be inferred beyond a reasonable doubt from the proven facts. In doing so, you may consider the person's conduct and all of the circumstances surrounding that conduct including but not limited to the following:
"What, if anything, did the person do or say?
"What result, if any, followed from the person's conduct?
"Was that the result of the natural, necessary and probable consequence of that conduct?
. . .
"The second count of the indictment charges the defendant with the crime of Assault in the First Degree. Under our law, a person is guilty of Assault in the First Degree when with intent to cause serious physical injury to another person, he causes such injury to that person by means of a deadly weapon.
. . .
"Serious physical injury means impairment of a person's physical condition which creates a substantial risk of death or which causes death or serious and protracted disfigurement or protracted impairment of health or protracted loss or impairment of the function of any bodily organ.
. . .
"Deadly weapon means any loaded weapon from which a shot readily capable of producing death or serious physical injury may be discharged."
When reading the elements of each of the two charges, attempted murder in the second degree and assault in the first degree, the court stated that the third element was "that the defendant was not justified."
In my opinion, any error in the charge to the jury was harmless as "there was overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given" (People v Petty, 7 NY3d 277, 286 [2006]; People v Jones, 3 NY3d 491, 497 [2004]). We have specifically stated in numerous decisions that the Velez error was not harmless, suggesting that under certain facts any Velez error may be deemed harmless
(see People v Marcucci, 158 AD3d 434 [1st Dept 2018]; People v Valentin, 154 AD3d 474, 475 [1st Dept 2017]; People v Flores, 145 AD3d 568, 569 [1st Dept 2016], lv dismissed 29 NY3d 997 [2017]; People v Delin, 145 AD3d 566, 567 [1st Dept 2016], lv dismissed 29 NY3d 996 [2017]. In my opinion the facts in this case support such a finding.
It is clear that as instructed, the jury first considered the defense of justification. And, after considering it, found that it was not supported by the credible evidence. The only "evidence" of justification was the testimony of Knowles. As argued by the People and conceded in part by the defense, her testimony was at times inconsistent, vague and confusing. Further, her testimony was contrary not only to that of the other witnesses (including that of defendant) but also to the physical evidence.
Payne testified that at the time of the incident he saw no one on the street other than O'Brien and defendant. According to Payne, he did not see (or hear) Knowles or see a woman gardening. Knowles testified that at one point O'Brien was holding the knife close to his head, extended outward. The eyewitness did not testify, as suggested by the majority, that she observed O'Brien running toward defendant and then heard shots fired [FN1]. Payne testified that he never saw a knife in O'Brien's hand or saw O'Brien chasing defendant down the street. No knife was recovered from the scene, the surrounding area or from O'Brien's person at the scene or at the hospital. According to Payne, he remained with O'Brien until O'Brien was actually placed in the ambulance. During this time he never saw O'Brien in possession of a knife.
Perhaps most telling, and not mentioned by the majority, is the testimony of defendant. [*5]Defendant testified that he did not know O'Brien and never had a physical altercation with him. Thus, defendant himself refuted the defense of justification. Based upon his testimony that there was no altercation with O'Brien, defendant could not have been in imminent danger of O'Brien's use of deadly force, and such a belief would be objectively unreasonable (see People v Daggett, 150 AD3d 1680 [4th Dept 2017], lv denied 29 NY3d 1125 [2017]; People v Palmer, 34 AD3d 701, 703-704 [2d Dept 2006], lv denied 8 NY3d 848 [2007]). It is clearly discernable that acquittal of the top count was not based on the jurors' finding of justification.
The evidence supports the conclusion that after considering and rejecting the defense of justification, the jury then proceeded to consider the charges of attempted murder in the second degree and assault in the first degree. In doing so, they concluded that defendant did not intend to cause O'Brien's death, but that he did intend to cause serious physical injury to O'Brien.
It is certainly plausible that the jury found that defendant, while angry that O'Brien had earlier cut or tore defendant's jacket, did not intend to kill O'Brien for the damage he caused to the jacket. This is buttressed by the fact that the evidence elicited was that defendant shot O'Brien three times. The 9 millimeter semiautomatic that was recovered had one round in the chamber and two rounds in the magazine. Thus, the jury could have reasonably concluded that if defendant had actually intended to kill O'Brien he had three additional rounds of
ammunition to do so.
Therefore, for the reasons stated above, I would affirm the conviction in all respects.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JUNE 7, 2018
CLERK



Footnotes

Footnote 1: I assume the majority is referring to the testimony of Knowles.